

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

UNITED STATES OF AMERICA,

v.

RODNEY ALEXANDER MITCHELL,

Defendant.

Action No. 3:11-CR-286-2

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Rodney Mitchell's *Pro Se* Letter Motion for a New Trial. (Doc. No. 33.) For the reasons stated below, the Court DENIES the Motion.

### I.    BACKGROUND

On May 17, 2011, Drug Enforcement Agency ("DEA") agents executed a search warrant on an apartment located on Hull Street Road, in Richmond, Virginia, having been led to the apartment after completing a number of controlled buys from individuals in the Richmond area targeted for distributing heroin. At about 6:00 PM, the agents knocked and announced their presence at the front door of the apartment, heard someone yell "S***!" and then forced entry. At that moment, Agent Steven Miller heard glass breaking in a back bedroom, and also glimpsed an individual jumping off of a second floor balcony. Two daredevils had attempted an escape: the glass-breaking stuntman being Walter Mitchell, and the balcony-jumper—whose fall was broken by an air-conditioning unit—being Mark Lawrence.

These two men and four others found in the apartment—Keith Henderson, William Dugger, Christopher Harris, and Rodney Mitchell (Walter Mitchell's brother)—were

1

arrested, taken into custody,[1] and charged. All but Walter Mitchell, who was charged by federal authorities, received state charges.

In executing the search warrant, the DEA agents found a total of approximately 1.3 kilograms of heroin; a bright orange kilogram press used to compress drugs in powder form into kilogram-sized bricks (indeed, approximately 1 kilogram of the heroin recovered was found in such a brick on the press); a number of "Magic Bullet" blenders (used to grind cutting agents employed to dilute drug product) soiled with light brown residue; and three firearms: a Smith & Wesson .500 magnum, a 1911 .45 caliber semiautomatic handgun, and a pistol-grip 12-gauge shotgun. The guns were found in the pantry, while the kilogram press and brick of heroin were found in one of the apartment's two bedrooms. The other bedroom—filled with electronic equipment—resembled a recording studio.

Later the same night, Agent Miller interviewed one of the arrestees, William Dugger, at Richmond City Police headquarters. Giving Agent Miller background on events leading up to the execution of the search warrant, Dugger told Miller that in the preceding months, he had been incarcerated for some 90 days (apparently somewhat unexpectedly)[2] on a state larceny conviction. Dugger and Walter Mitchell, who knew each other because Mitchell had dated Dugger's sister, arranged for Mitchell to stay at Dugger's apartment while Dugger was incarcerated. The arrangement was beneficial for both parties: Walter Mitchell needed a place to stay and Dugger wanted to make sure he didn't lose his apartment and the valuable electronic deejaying equipment he was forced to leave behind.

---

[1] Walter Mitchell and Mark Lawrence were hospitalized first.
[2] The state judge sentenced Dugger to 90 days on his guilty plea in spite of the parties' agreement to a sentence that involved no jail time.

Dugger was released from state custody on the larceny conviction on May 8, 2011. He went back to his apartment, but never moved back in, because he was uncomfortable with the atmosphere and the presence of people he didn't know. Dugger's belongings from all over the apartment had been put into the bedroom where he had left his deejaying equipment; Dugger returned two or three times to collect his things and bring them to his girlfriend's place, where he was staying. When the search warrant was executed on May 17, 2011, Dugger was in the bedroom containing his belongings, including the deejaying equipment. In fact, he was doing recording work for Walter Mitchell when DEA agents kicked in the bedroom door and Mitchell jumped out of the bedroom window.

On June 17, 2011, the Government provided discovery to Walter Mitchell's attorney. Included in the discovery was Agent Miller's written report memorializing his May 17, 2011 interview with Dugger. Agent Miller considered Dugger to be a potential witness based on the information Dugger had revealed in his interview.

The state charges against Dugger and Keith Henderson arising out of the evidence recovered from the search warrant were nolle prossed. Christopher Harris and Mark Lawrence's state charges were dismissed as well, but replaced with federal charges: on July 13, 2011, a federal grand jury returned a Superseding Indictment charging Walter Mitchell, Christopher Harris, and Mark Lawrence with conspiracy to distribute and possess with the intent to distribute more than a kilogram of heroin; distribution of heroin; and possession with the intent to distribute heroin. Christopher Harris and Walter Mitchell were also charged in the Superseding Indictment with firearms offenses. At the arraignment hearing held on July 18, 2011, the Court set a trial date of September 26, 2011.

At trial, Dugger testified he was scheduled to host and deejay a "showcase" event at the Skyy Lounge in Richmond, Virginia, on July 21, 2011. Dugger posted a flyer promoting the event on his Facebook page. The idea of such a showcase is to highlight local music talent by giving them the opportunity to perform a segment of their work. Showcases are held weekly at the Skyy Lounge.

On the afternoon of the July 21 showcase, Dugger received a call from Christopher Harris's brother Sherard. Sherard Harris asked Dugger what he had going on that day. Dugger recalled that he thought he may have told Harris he was hosting a gig, but he didn't remember telling him exactly where. At about 9:30 or 9:45 PM that evening, Dugger, running late for the showcase, arrived at the Skyy Lounge, parking in the back of a dark alley immediately adjacent to it. After Dugger got out of his car to make his way toward the front of the alley and the entrance to the Skyy Lounge, he was approached by Rodney Mitchell, Sherard Harris, and a third unknown individual. All three were dressed in dark clothing and Mitchell and Harris had on sunglasses.

When Rodney Mitchell approached Dugger and indicated he needed to talk to him, Dugger reached out to give Mitchell a "dap" or "fist bump." Mitchell refused the greeting, telling Dugger that he wasn't going to shake his hand because he had snitched on his brother and "gave him 20 years." (Trial Tr. vol. 1, 73, Jan. 30, 2012.) Dugger responded that he didn't know what Mitchell was talking about, but Mitchell replied to the effect of, "You didn't forget what I said, did you? You remember I said when I found out who it is, I'm going to kill them." (Trial Tr. 73.) Sherard Harris then told Dugger that they needed to talk at the back of the alley, but Dugger moved quickly out to the light where he could be seen by others going into the Skyy Lounge. Dugger testified that Rodney Mitchell seemed

4

serious, and that before Sherard Harris told him they needed to talk at the back of the alley, he had been standing back a little bit with his hand in his shirt. Dugger thought Harris might have been trying to scare him and lead him to believe that he had a gun.

After Dugger made his way into the club to set up for the showcase, he saw that he had missed a call from Sherard Harris. Dugger returned Harris's call, and agreed to talk to him in order to clear the air, but told Harris not to scare him like he had outside of the club. When Sherard Harris made his way in, Dugger led him to the bathroom so they could talk. In the bathroom Sherard Harris told Dugger that they knew he was the informant—that it was "black and white"—and indicated that he learned the information from his brother Christopher Harris. Dugger took this to mean that the fact that he had cooperated with law enforcement was on paper or some official document. Rodney Mitchell also came into the bathroom, and at some point thereafter, Sherard Harris said something to the effect of "they had it on paperwork and . . . if they f[oun]d out it [wa]s me, then my life [would not be] spared." (Trial Tr. 78.) Dugger testified that he felt intimidated and threatened by the entire situation, and that his teeth were chattering and arms were shaking. He also said that Sherard Harris and Rodney Mitchell mentioned something about him testifying in front of a grand jury, which Dugger knew nothing about. Dugger testified further that Sherard Harris and Rodney Mitchell told Dugger not to talk to the police. Dugger replied that he wasn't talking to the police and that he wouldn't testify in court. At trial, Dugger confirmed that at the time of the incident, he was so scared that he had no intention of testifying against anyone. Dugger only contacted law enforcement about the incident after Dugger's attorney contacted him and told him "[t]hey were going to come and try to kill [him]." (Trial Tr. 82.)

Meanwhile, some time after the July 18, 2011 arraignment, when the September 26, 2011 trial date was set, Agent Miller received a tip from a confidential informant. Based on that tip, Agent Miller requested the audio of jail phone calls from Walter Mitchell and Christopher Harris over a block of time subsequent to their incarceration on the federal charges.

At trial, the Government played a number of jail calls. Two of the calls were between Christopher Harris and his brother Sherard. In the first of these two calls, which occurred around the time of the incident at the Skyy Lounge, Sherard Harris told his brother about how he found Dugger was hosting the showcase at the Skyy Lounge on July 21, 2011. Christopher Harris then told Sherard to "deliver a message" to Dugger. In the second of these calls between the Harris brothers, Sherard described to his brother Christopher what Rodney Mitchell did at the Skyy Lounge. In response to this information, Christopher Harris became agitated, indicating his displeasure with Mitchell's aggressive actions toward Dugger. In another call, Rodney Mitchell told his brother Walter about his behavior toward Dugger at the Skyy Lounge. And in yet another call made several days after the Skyy Lounge incident, Rodney Mitchell spoke with Christopher Harris to update him with respect to the threats made to Dugger, telling Harris, "He ain't gonna show."

After a trial held on January 30 and 31, 2012, a jury convicted Rodney Mitchell of conspiracy to tamper with a witness in violation of 18 U.S.C. § 1512(k). The Court received and filed the instant *Pro Se* Letter Motion for a New Trial on February 13, 2012, exactly 13 days after the jury announced its verdict.

## II.   LEGAL STANDARD

Under Federal Rule of Criminal Procedure 33, "the [district] court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A criminal defendant has three years after the verdict to bring a motion for a new trial under Rule 33 where the motion is grounded on the basis of newly discovered evidence. Fed. R. Crim. P. 33(b)(1). A motion for a new trial brought on the basis of any other ground "must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2).

Whether to award a new trial is within the district court's broad discretion. *See United States v. Smith*, 451 F.3d 209, 216–17 (4th Cir. 2006). The discretion to award a new trial, however, should be used sparingly. *Id.*

## III.   ANALYSIS

Mitchell asserts in his *Pro Se* Motion that he is entitled to a new trial for two reasons. First, he first asserts that the weight of the evidence presented at trial was insufficient to support the jury's finding of guilt. Second, Mitchell claims ineffective assistance of counsel. At the hearing, Mitchell's newly appointed attorney argued that certain phone calls reviewed after the filing of Mitchell's Motion constituted "newly discovered evidence" that likewise warrants a new trial. All three arguments Mitchell advances in support of his request for a new trial are assessed in turn.

### A.  Weight of the Evidence

When a new trial motion attacks the weight of the evidence as insufficient to support the verdict, the district court's discretion is broader than when it is faced with a motion to acquit on the same ground: when deciding a new trial motion, the district court need not view the evidence in the light most favorable to the Government, and may assess

witness credibility. *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985). Nonetheless, "a new trial should be granted only when the evidence weighs heavily against the verdict." *Id.* at 1486.

Mitchell's new trial motion contains only a conclusory allegation that the weight of evidence was insufficient to support the jury's finding of guilt. In this case, the Indictment alleged that Mitchell conspired, 18 U.S.C. § 1512(k), to knowingly intimidate, threaten, or persuade another person, *id.* § 1512(b), with three types of intent: (1) to influence, delay, or prevent the person's testimony in an official proceeding, *id.* § 1512(b)(1); (2) to cause or induce the person to withhold testimony from an official proceeding, *id.* § 1512(b)(2)(A); and (3) to hinder, delay, or prevent communication to a law enforcement officer, *id.* § 1512(b)(3). In order to secure a conviction, then, the Government needed to prove that Mitchell entered into a conspiracy the object of which was to knowingly intimidate, threaten, or persuade another person with any of the three types of intent set out above.

In order to prove a conspiracy, the Government "must establish an agreement to commit an offense, willing participation by the defendant, and an overt act in furtherance of the conspiracy." *United States v. Tucker*, 376 F.3d 236, 238 (4th Cir. 2004) (citing *United States v. Edwards*, 188 F.3d 230, 234 (4th Cir. 1999)). A defendant's "[k]nowledge and participation in the conspiracy may be proven by circumstantial evidence." *Id.* (citing *United States v. Meredith*, 824 F.2d 1418, 1428 (4th Cir. 1987)).

The Government presented more than ample proof from which a jury could conclude that Rodney Mitchell conspired to tamper with a witness. Dugger testified that Rodney Mitchell, Sherard Harris, and a third unknown individual approached him in a dark alley outside of the Skyy Lounge on the night of July 21, 2011. Dugger told the jury that

8

Rodney Mitchell refused to acknowledge him, asserted that he had snitched on his brother Walter Mitchell, and reminded Dugger that he had told him he would kill the snitch when he identified him. The jury also heard Dugger testify that when he and Sherard Harris made their way into the bathroom of the Skyy Lounge to talk, Harris likewise indicated that he knew Dugger had cooperated with law enforcement, and that his life would not be spared. Dugger also said that Sherard Harris and Rodney Mitchell made statements about testifying to the grand jury, and that they told him not to talk to the police. Finally, Dugger told the jury that he was intimidated and frightened by the entire situation, that his teeth were chattering and arms were shaking, and that at the time, he meant it when he told Rodney Mitchell and Sherard Harris that he would not talk to the police or testify in court.

Dugger's testimony was highly corroborated by the jail calls, two of which contained admissions from Rodney Mitchell himself. In one of the jail calls, Rodney Mitchell told his brother Walter what had happened at the Skyy Lounge, and in another, Rodney Mitchell told Christopher Harris that in light of the threats, he didn't think Dugger would "show." Dugger's retelling of the events at the Skyy Lounge were further corroborated by two other calls between Christopher Harris and his brother Sherard. In the first of the two calls, Sherard told Christopher about Dugger's deejaying gig, and Christopher told Sherard to "deliver a message" to Dugger. In the second call, Sherard recounted what Rodney Mitchell did, which agitated Christopher, who apparently believed Rodney Mitchell went too far.

After hearing this evidence, the jury had more than enough from which to conclude that Rodney Mitchell agreed to knowingly threaten, persuade, or influence William Dugger with any one of the three types of intent proscribed in subsection (b) of the witness tampering statute (influence, delay, or prevent court testimony; withhold court testimony;

9

or hinder, delay, or prevent communication to police), that he committed an overt act in furtherance of the conspiracy, and that he participated in the conspiracy willingly. Mitchell's request for a new trial on the basis of insufficiency of the evidence will therefore be denied.

## B. Ineffective Assistance of Counsel and Newly Discovered Evidence

In contrast with his conclusory assertion regarding the sufficiency of the evidence, Rodney Mitchell makes a number of claims with respect to his allegations of ineffectiveness on the part of his trial counsel. At an evidentiary hearing held on Rodney Mitchell's ineffective assistance allegations, however, Mitchell's newly-appointed counsel narrowed Mitchell's claims to one particular issue: whether certain jail phone calls made by Dugger that were not presented to the jury at Mitchell's trial form an adequate basis for granting Mitchell a new trial, under either the theory of ineffective assistance, or newly discovered evidence.

To understand the issue, we must go back in time to Friday, January 27, 2012. With trial set to begin the following Monday, Mitchell's trial counsel filed a motion to continue, citing his inability to review more than 500 jail calls made by Dugger while Dugger was in state custody on charges related to the execution of the search warrant at the Hull Street apartment. The motion to continue stated:

> Defendant and alleged victim [William Dugger] and others were incarcerated
> last year at Richmond City Jail on charges of drug distribution and firearms
> possession. Those state charges became federal charges for some of the
> accused. While in City Jail [Dugger] made efforts to get a third party to accept
> responsibility for the firearms. It is believed that [Dugger] communicated by
> jail phone with the third party in an effort to get the third party to accept
> responsibility for the firearms. The jail calls for [Dugger] have been obtained
> by defense counsel. There are more than 500 calls, which will take weeks to
> review. Despite the efforts of counsel, all of the phone calls cannot be
> reviewed prior to trial. If [Dugger] solicited a third party to take

10

responsibility for [his] criminal actions, then that would impeach [Dugger]'s credibility.

(Def.'s Mot. Cont. 1, Doc. No. 25.) The Court denied the motion to continue on the same day it was filed, noting that trial counsel had been afforded ample time to prepare evidence for trial, including possible impeachment materials. (Order, Doc. No. 27.)

At the evidentiary hearing, Rodney Mitchell's trial counsel explained the circumstances that gave rise to the motion for continuance, and that are the subject of Mitchell's claims of ineffective assistance and newly discovered evidence. Trial counsel recalled that he first became involved in Mitchell's case on November 22, 2011, at the time of Mitchell's detention hearing. In a meeting some time after the detention hearing, Mitchell told trial counsel that Dugger made calls from the Richmond City Jail to a third party named "Tamir" in an effort to convince Tamir to accept responsibility for the firearms that were recovered from the Hull Street apartment. Mitchell's claim was that Dugger made the calls at some point while Dugger, Rodney Mitchell, and the others charged in connection with the execution of the execution of the search warrant at the Hull Street apartment were incarcerated together at the Richmond City Jail. Rodney Mitchell told his trial counsel Dugger went to make a phone call, and that upon his return, told Rodney Mitchell that an individual named Tamir would take responsibility for the guns. Under the circumstances, Mitchell inferred that Dugger had arranged for Tamir to accept responsibility for the firearms in the call he had made moments before, or in some other call made while he was housed at the Richmond City Jail.

Some time shortly before the Christmas holiday, trial counsel began looking into how he might obtain recordings of Dugger's calls from the Richmond City Jail. On January 4, 2012—26 days before the trial date—counsel served a subpoena on the Richmond City Jail

for the calls. The Jail complied with the subpoena on January 17, turning over recordings of 523 calls, each 15 minutes in length, made between May 16 and June 16 of 2011. Trial counsel began his review of the calls on January 18, some 12 days before trial. At the hearing counsel explained that while he was surprised at the sheer volume of the calls—by his calculations Dugger averaged more than 17 calls per day during his approximate one-month jail stay—he nevertheless spent five days reviewing an estimated 75–100 calls. In his review, counsel never came across any "hang-up" calls, leading him to believe that all 523 calls were indeed 15 minutes in length. In trial counsel's estimation, it would take 120 hours to review all of the calls. Counsel was not able to narrow down the calls to review, and admitted that reviewing the calls for the information he was looking for would be akin to searching for a needle in a haystack for two weeks. Trial counsel testified that he believed he never heard the call containing the information he was looking for, and that if he did, he certainly did not recognize it.

Given his lack of success in reviewing the calls, trial counsel made other efforts to corroborate the information. Rodney Mitchell had told trial counsel that not only he, but also Keith Henderson, heard Dugger say Tamir would take responsibility for the guns. To follow up, trial counsel went to an address listed for Henderson, and spoke with someone fitting Henderson's description. That individual, however, averred that Mr. Henderson "was not home." Rodney Mitchell also told trial counsel that Tamir had approached his brother Walter's attorney about taking responsibility for the guns. Walter Mitchell's attorney told trial counsel that he could not recall being approached by anyone about taking responsibility for the firearms. Finally, trial counsel asked the General Counsel of the

Richmond City Jail whether he could obtain recordings of any face-to-face meetings Dugger may have had at the jail, and was told he could not obtain anything of that nature.

With the trial date looming, and having made no headway with the calls, trial counsel focused his energy on other trial preparation. In making this decision, counsel reasoned that first, he did not know whether the call he was looking for existed at all: he was yet to find anything in his review, and the notion that there was such a call had only come from his client. Second, trial counsel thought that even if there was such a call, he might not be able to prove that someone other than Tamir was responsible for the guns. That information would be unlikely to surface directly in a phone call, and furthermore, Rodney Mitchell was unable to provide trial counsel any proof regarding ownership of the guns. Third, trial counsel was concerned that even if he did find the information he sought, it might be inadmissible extrinsic evidence on a collateral matter. Finally, and relatedly, trial counsel acknowledged at the hearing that he believed the information he was looking for was only for impeachment. Trial counsel nevertheless filed the motion to continue the Friday before trial was set to begin when Rodney Mitchell asked him to do so.

At the evidentiary hearing, Rodney Mitchell's newly appointed counsel, who completed a review of all of the phone calls at issue, played portions of two recorded jail calls made by Dugger to someone named "Tamir." In one call, Dugger spoke in code to Tamir about a "microphone" and "two other speakers in the crib." Dugger told Tamir in the call, "Need them to be your speakers." In a later call, Dugger asked Tamir whether he got what Dugger was talking about the day before, and that it would "change everything." Dugger also told Tamir that the "speakers" were "clean" and that he bought them "new."

Rodney Mitchell's newly-appointed counsel argues that the recordings introduced at the evidentiary hearing justify a new trial under Rule 33 under either the theory of newly discovered evidence or ineffective assistance of counsel. With respect to the former, Rodney Mitchell contends that the recordings constitute new evidence because they simply were not available to him at trial, or at least not practically available. In Rodney Mitchell's view, the jury could have concluded from the recordings that Dugger was indeed responsible for the firearms recovered from the search warrant, that it was plain that Dugger had an interest in the criminal activity occurring at the apartment, and that he did attempt to have someone else take responsibility for his own criminal behavior.

Rodney Mitchell asserts that the jury could have found that contrary to Dugger's representations, Dugger was no innocent bystander. Mitchell argues that the recordings would have been relevant to the jury's consideration of Dugger's motive to concoct a story about witness intimidation in order to shine the light away from himself and onto the others arrested in connection with the execution of the search warrant. According to Rodney Mitchell, under *United States v. McCoy*, 478 F.2d 846 (4th Cir. 1973), where newly discovered evidence goes directly to the interest of a witness essential to the prosecution, a new trial should be awarded where the interest of the witness is shown. He contends that this is precisely such a situation.

With respect to the latter theory of ineffective assistance of counsel, Rodney Mitchell argues that if the Court were to find Mitchell's trial counsel deficient under the first prong of *Strickland v. Washington*, 466 U.S. 668 (1984), the recordings would pass muster under *Strickland*'s prejudice prong, because there is a reasonable probability that if the recordings had been introduced at the trial, the result of the trial would have been

different. Undergirding both of Rodney Mitchell's theories is his assertion that the recordings are not mere impeachment material; as Mitchell would have it, they are more than that because they go to Dugger's entire role in the criminal activity involved.

Under either theory, Rodney Mitchell's request for a new trial fails. Despite Mitchell's protestation to the contrary, the information trial counsel sought, and that his newly-appointed counsel eventually found, is impeachment, plain and simple. The fundamental and overriding issue, however, is whether the jury would have reached a different result had they heard the phone calls at issue. The answer to that question must be in the affirmative in order for Mitchell to be granted a new trial under either the newly discovered evidence or ineffective assistance theory: the fifth and final prong that must be satisfied in order to justify a new trial on the basis of newly discovered evidence is that the evidence would probably result in an acquittal, *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1993),[3] and the second, "prejudice" prong of the familiar two-part ineffective assistance inquiry is that the defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.[4] So the question ultimately is whether the

_____

[3] Newly discovered evidence constitutes a basis for a new trial only upon satisfaction of a five-part test: (1) the evidence must in fact be newly discovered; (2) there must be facts alleged by the defendant from which the Court can infer diligence; (3) the evidence on which the motion is based must not be merely cumulative or impeaching; (4) the evidence is material to the issues; and (5) the evidence would probably result in an acquittal in a new trial. *Custis*, 988 F.2d at 1359.

[4] While claims of ineffective assistance are most commonly litigated on collateral review, Mitchell's ineffective assistance claim, filed within the 14-day window of Rule 33(b)(2), is properly before the Court. *See United States v. Martinez*, 136 F.3d 972, 979–80 (4th Cir. 1998) (explaining that ineffective assistance claims can be brought in a timely new trial motion based on "other grounds," on direct appeal if the claim of ineffective assistance

15

evidence at issue, whether newly-discovered or not discovered due to deficient performance on the part of trial counsel, would have changed the outcome.

Assuming for purposes of decision that the contents of the recordings introduced at the evidentiary hearing constitute newly discovered evidence, and that the failure of Mitchell's trial counsel to find those contents was objectively deficient, *see id.* at 688, there is no question that the jury would have reached the same result even had they heard the recordings at trial. If the Government's case rose and fell on Dugger's testimony, we might have a different case. But Dugger's testimony was highly corroborated by at least four jail calls, two of which contain admissions from Rodney Mitchell himself. The calls explain how Sherard Harris found out about Dugger's hosting a deejaying showcase at Skyy Lounge, include Christopher Harris's instructions to his brother Sherard to "deliver a message," and describe the events of the tampering. With this sort of corroboration, the jury would reach same result ten times out of ten, even if it heard the recordings of Dugger's calls. Accordingly, Mitchell's request for a new trial on the basis of newly discovered evidence and ineffective assistance of counsel will be denied.

## IV.   CONCLUSION

For the reasons stated above, Defendant's *Pro Se* Letter Motion for a New Trial is DENIED.

Let the Clerk send a copy of this Memorandum Opinion to Defendant and all counsel of record.

---

appears conclusive, and on collateral review); *United States v. Smith*, 62 F.3d 641, 650–51 (4th Cir. 1995) (same).The *Strickland* standard applies whether the challenge occurs in the Rule 33 context or on collateral review. *See United States v. Russell*, 221 F.3d 615, 620 (4th Cir. 2000).

An appropriate order shall issue.

It is SO ORDERED.

_____/s/_____
James R. Spencer
United States District Judge

ENTERED this __6th__ day of June 2012